IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,   )
                                )
                  Plaintiff,    )   District Court
vs.                             )   Case No.
                                )   10-10137
GARY JAY HIBLER,                )
                                )
                  Defendant.    )


TRANSCRIPT OF SENTENCING


       On the 25th day of March, 2011, came on to be heard
proceedings in the above-entitled and numbered cause
before the HONORABLE ERIC F. MELGREN, Judge of the
United States District Court for the District of Kansas,
sitting in Wichita, commencing at 2:08 p.m.  Proceedings
recorded by machine shorthand.  Transcript produced by
computer-aided transcription.


APPEARANCES:

The plaintiff appeared by and through:
          Mr. Jason W. Hart
          United States Attorney's Office
          301 North Main
          1200 Epic Center
          Wichita, Kansas  67202

The defendant appeared by and through:
          Mr. Steven K. Gradert
          Federal Public Defender's Office
          850 Epic Center
          301 North Main
          Wichita, Kansas 67202-1508

3-25-11   USA v. HIBLER   10-10137

2

| | | |
|---|---|---|
| 14:08:32 | 1 | COURTROOM DEPUTY:  All rise.  The United States |
| 14:08:37 | 2 | District Court for the District of Kansas is now in session, |
| 14:08:39 | 3 | the Honorable Eric F. Melgren presiding. |
| 14:08:41 | 4 | THE COURT:  Good afternoon.  You may be seated. |
| 14:08:44 | 5 | We're here on the case of the United States versus |
| 14:08:50 | 6 | Gary Jay Hibler, Case No. 10-10137.  United States appears by |
| 14:09:00 | 7 | Assistant United States Attorney Jason Hart.  Defendant appears |
| 14:09:03 | 8 | by his counsel Assistant Federal Public Defender Steve Gradert |
| 14:09:07 | 9 | and in person.  We're present for this time set for sentencing. |
| 14:09:15 | 10 | Sir, you are Mr. Hibler? |
| 14:09:17 | 11 | THE DEFENDANT:  Yes. |
| 14:09:18 | 12 | THE COURT:  We're here pursuant to a presentence |
| 14:09:21 | 13 | investigation report that's been prepared by the United States |
| 14:09:24 | 14 | Probation Office.  Have you had an opportunity to review that |
| 14:09:26 | 15 | report and discuss it with your attorney? |
| 14:09:27 | 16 | THE DEFENDANT:  Yes, Your Honor. |
| 14:09:28 | 17 | THE COURT:  And Mr. Gradert has noted an |
| 14:09:34 | 18 | objection -- actually, I don't think you filed an objection.  I |
| 14:09:37 | 19 | think you filed a sentencing memorandum. |
| 14:09:38 | 20 | MR. GRADERT:  It is, Your Honor.  It's a request |
| 14:09:40 | 21 | for a variance.  It's not an objection to any of the |
| 14:09:43 | 22 | calculations. |
| 14:09:43 | 23 | THE COURT:  Thank you.  So did you have any |
| 14:09:47 | 24 | objections to any of the factual matters stated in there, |
| 14:09:50 | 25 | Mr. Hibler, that you wanted to note? |

14:09:52    1          THE DEFENDANT:  No.

14:09:53    2          THE COURT:  Very well.  Well, counsel, the matter

14:09:57    3    presents itself on an offense level 39 and a criminal history

14:10:03    4    category of II, which calculates to a guideline sentence of 292

14:10:07    5    to 365 months.

14:10:09    6          And, Mr. Gradert, I've read your sentencing

14:10:11    7    memorandum.  And I think what I'll do at this point is hear

14:10:15    8    arguments and remarks by counsel with respect to that issue.

14:10:19    9    And then following that, I'll give Mr. Hibler an opportunity to

14:10:22   10    make any statement he would like to the Court.

14:10:25   11          MR. GRADERT:  Thank you, Your Honor.  I'll go to

14:10:28   12    the podium --

14:10:28   13          THE COURT:  Certainly.

14:10:29   14          MR. GRADERT:  -- Your Honor.

14:10:31   15          Your Honor, as I indicated in my sentencing

14:10:35   16    memorandum, for years and years I've been arguing on these

14:10:38   17    child pornography cases that we needed to go after the people

14:10:42   18    that are making these videos and producing them and

14:10:45   19    distributing them all around the world.  And I find myself in

14:10:50   20    the unusual circumstance of representing somebody, for the very

14:10:53   21    first time now in all these years I've been here, with an

14:10:56   22    actual production case.

14:10:58   23          And so I knew it was going to present a different

14:11:01   24    level of problem than any other case I've ever had.  And, in

14:11:05   25    fact, as Mr. Hart knows, our office and offices around the

14:11:10   1    country have spent a lot of time attacking the sentencing

14:11:16   2    guidelines and Congress' handling of the sentencing guidelines

14:11:18   3    when it comes to the -- in the child pornography area as being

14:11:23   4    not very well thought out, not very well studied, much higher

14:11:29   5    than necessary, because we've seen dramatic increases in the

14:11:32   6    sentences for these things over the last 10 to 20 years.

14:11:38   7            The large bulk of people convicted of crimes

14:11:41   8    involving child pornography in -- you know, before my time

14:11:44   9    received probation sentences for these types of things.  Now

14:11:48   10   the prison sentences are longer than for some people who

14:11:51   11   sometimes actually commit contact sexual offenses or even more

14:11:56   12   heinous-type crimes like murder.

14:11:58   13           THE COURT:  You think the sentencing guidelines

14:12:00   14   have departed materially from what Congress' intent would be

14:12:05   15   the punishment for these offenses should be?

14:12:08   16           MR. GRADERT:  I don't think that they have, with

14:12:11   17   regard to Congress' intent, because I think Congress kind of

14:12:15   18   forced these guidelines on the sentencing commission.  And they

14:12:22   19   are not given the same kind thought processes that the other

14:12:27   20   sentencing guidelines that have been molded and changed and

14:12:30   21   gone through over 700 amendments over the years have gone

14:12:36   22   through to get them to an appropriate level.

14:12:38   23           But in this particular instance, because it is a

14:12:41   24   production case, I think we're talking about a different

14:12:44   25   creature.  And it is a serious offense.  I think my sentencing

14:12:48   1    memorandum clarifies that we're not trying to say that this is

14:12:53   2    not a real big problem, a terrible problem.  So what I decided

14:12:57   3    to do in this case, Your Honor, was try to just take a look at

14:13:00   4    this particular case.

14:13:01   5            You know, I know that the sentencing guidelines

14:13:04   6    try to come up with something in terms of conformity in

14:13:10   7    sentencing or to avoid unwarranted disparity, I think, is the

14:13:16   8    actual language.  But there are cases that are different, and I

14:13:21   9    think this case is one of them.

14:13:24  10            Mr. Hart took issue with the fact that I tried to

14:13:28  11    suggest that -- and by the way, I would like to clarify one

14:13:32  12    thing up front.  Mr. Hibler has really pretty much thrown

14:13:37  13    himself on the mercy of the Court.  He didn't want to put his

14:13:41  14    son through a trial.  He has admitted what he did was wrong.

14:13:49  15    He recognizes that.  I do believe that he's amenable to

14:13:55  16    treatment and help for whatever has caused him to get to the

14:13:59  17    level that he's in, and so many of the comments that are in the

14:14:02  18    sentencing memorandum are not directly related to the

14:14:05  19    defendant; they're my comments.  And when I made reference to

14:14:08  20    the fact that this is less-egregious conduct than what I

14:14:13  21    believe is the typical when it comes to child pornography, I

14:14:18  22    guess part of that comes from the fact that I've seen so much

14:14:21  23    of this over the last 24, 25 years of my practice.

14:14:26  24            I've seen urination on children.  I've seen anal

14:14:33  25    intercourse.  I've seen oral copulation.  I've seen a variety

| | | |
|---|---|---|
| 14:14:38 | 1 | of things too despicable to even really describe. What I saw |
| 14:14:45 | 2 | in this case were two people masturbating, and one was a child |
| 14:14:52 | 3 | and one was a parent. And my client's certainly not going to |
| 14:14:56 | 4 | get the "parent of the year" award for this. He recognizes |
| 14:14:59 | 5 | that what he did was stupid, immature, never should have |
| 14:15:05 | 6 | involved his son. But I still would submit that when Congress |
| 14:15:10 | 7 | looked at the idea of getting involved in child pornography, |
| 14:15:13 | 8 | they were looking at it from a different perspective. And I |
| 14:15:17 | 9 | think what we're going to see, Your Honor, as we see more |
| 14:15:20 | 10 | production cases, and as I pointed out, I think this may be the |
| 14:15:25 | 11 | first production case in the division here in Wichita that I |
| 14:15:29 | 12 | can recall, certainly there have been a few others in the state |
| 14:15:33 | 13 | and I think Mr. Hart has pointed out perhaps five others for |
| 14:15:38 | 14 | the Court's -- to the Court's attention, and I think I was |
| 14:15:40 | 15 | aware of four of those. So -- and I don't know the facts and |
| 14:15:44 | 16 | circumstances around those, but I do know that there's going to |
| 14:15:47 | 17 | be different levels of these as they come in. |
| 14:15:49 | 18 | We have one pending that is what I think would |
| 14:15:52 | 19 | commonly be referred to as sexting. I don't know all the facts |
| 14:15:57 | 20 | of that case, but I do know it was something where a picture |
| 14:16:00 | 21 | was taken with a cell phone and then transmitted to somebody |
| 14:16:04 | 22 | else into the form of a text message, and it was a minor and, |
| 14:16:07 | 23 | therefore, it becomes a production case. |
| 14:16:09 | 24 | But I still submit that that's not the kind of |
| 14:16:12 | 25 | production that we see when we see these Vicky series and these |

14:16:17  1   series that have children that were abused and are in constant

14:16:21  2   circulation around the United States and around the world.

14:16:26  3   This was a fairly isolated incident that wasn't intended for

14:16:31  4   multiple distribution.  Unfortunately, I guess, it could have

14:16:37  5   been and may have been distributed by this other individual.

14:16:44  6           But because it is different than what you

14:16:48  7   typically see in these cases -- and by the way, my client did,

14:16:51  8   in fact, possess some of that other type of material, Your

14:16:55  9   Honor, and, you know -- so, obviously, he had an interest in

14:16:59 10   that type of material, but when it came to involving his own

14:17:02 11   child, it was a different situation.

14:17:06 12           When I get to the idea -- I think Mr. Hart

14:17:10 13   suggested that the defendant was trying to shift blame and make

14:17:13 14   himself a victim in this.  And that's not true.  But when I

14:17:16 15   listened to -- or not listened to but read the chats between

14:17:21 16   this person on the other end of this thing that -- where this

14:17:25 17   video was made through the webcam that my client transmitted,

14:17:33 18   as I was reading it, if I hadn't known that it was not law

14:17:38 19   enforcement, I kept thinking to myself, boy, this would be --

14:17:41 20   if this was law enforcement, this would be entrapment, because

14:17:44 21   it's a constant, you know, persuasion, "get your son to do

14:17:48 22   this," "get your son to do that."  Then when the son's on there

14:17:51 23   he's, like, "lift your shirt up and show us your belly button,"

14:17:55 24   "let's see the top of your underwear."  It's a constant urging

14:17:58 25   by this other person.  And ultimately because of his interest

14:18:02  1   in that other person, Gary allowed his son to be involved in

14:18:06  2   that, and that is why he is here today before this court, that

14:18:10  3   and his other collection of things involving child pornography.

14:18:16  4          I've said that there's no evidence that my client

14:18:21  5   had any contact, and Mr. Hart has taken issue with that.

14:18:25  6   Mr. Hart also takes issue with Dr. Flesher's findings that my

14:18:29  7   client is amenable to treatment and is not likely to reoffend

14:18:33  8   in this area again.  And part of his arguments in that regard

14:18:37  9   are that Dr. Flesher's comments and the comments about him not

14:18:42  10  having any other contact offenses are what the defendant has

14:18:46  11  said, and that's what the defendant told Dr. Flesher.

14:18:49  12         And Mr. Hart seems to think that somehow or

14:18:52  13  another when he tells him those things, that they're not true

14:18:57  14  because there's some statements contained in the chat that

14:19:00  15  would seem to contradict that.  But that's kinda like -- I

14:19:05  16  don't know how to describe this really, but like the pot

14:19:09  17  calling the kettle black, because what Mr. Hart wants to do is

14:19:13  18  he wants to believe that the statements that my client are

14:19:15  19  making in a chat are true and correct statements, and I would

14:19:22  20  submit that those are less likely to be true than the

14:19:25  21  statements once the defendant's been caught, once the defendant

14:19:28  22  recognizes that what he's done is wrong, is remorseful about

14:19:32  23  it, never been in any denial about it.

14:19:36  24         And I think that's significant, especially because

14:19:41  25  this whole concept of chat, and I've said for years and my wife

| | | |
|---|---|---|
| 14:19:45 | 1 | said -- and, fortunately, I'm not very computer literate, Your |
| 14:19:48 | 2 | Honor, and my wife doesn't even like to use e-mail, because we, |
| 14:19:54 | 3 | in our family, actually believe that computers have been kind |
| 14:19:58 | 4 | of the ruination of society.  They've dumbed us all down, and |
| 14:20:01 | 5 | they've allowed these kinds of things to happen where people |
| 14:20:05 | 6 | can take pictures of themselves masturbating and send 'em |
| 14:20:08 | 7 | across state lines to somebody else for their gratification. |
| 14:20:11 | 8 | And there's nothing illegal about it unless you involve your |
| 14:20:14 | 9 | son, as we have in this case, minor son, as we have in this |
| 14:20:18 | 10 | case. |
| 14:20:18 | 11 | But it's a strange world of fantasy.  And, you |
| 14:20:22 | 12 | know, if you look at other areas of pornography, we have 1-900 |
| 14:20:28 | 13 | numbers where people call and they talk to each other about sex |
| 14:20:31 | 14 | and they talk to each other about all kinds of bizarre |
| 14:20:34 | 15 | fantasies that they have, and the sex industry allows that, |
| 14:20:39 | 16 | feeds into that, and it goes on and on and on.  And that |
| 14:20:41 | 17 | doesn't necessarily mean that the people that are doing that |
| 14:20:44 | 18 | are going to go out and act on those things; it's just |
| 14:20:47 | 19 | something that they want to do, to live maybe vicariously, but |
| 14:20:52 | 20 | it doesn't necessarily make it true.  And it doesn't make it |
| 14:20:55 | 21 | correct.  And so many of the things that are said on there |
| 14:20:58 | 22 | aren't true. |
| 14:20:59 | 23 | In fact, we know in this particular case that the |
| 14:21:02 | 24 | person on the other end of all of this was purporting to be a |
| 14:21:07 | 25 | 22-year-old female and when, in fact, they were an adult male. |

14:21:12  1  And so it's a fantasy world and people are able to be what

14:21:19  2  they're not in real life.

14:21:21  3            And so I would submit that the statements about

14:21:24  4  that are uncorroborated by any other evidence.  The minor child

14:21:29  5  has been interviewed repeatedly and has never indicated that my

14:21:35  6  client has done anything other than --

14:21:37  7            THE COURT:  Well, he's neither admitted nor

14:21:39  8  denied.

14:21:39  9            MR. GRADERT:  That's correct.

14:21:40  10            THE COURT:  He's just not talking.

14:21:41  11            MR. GRADERT:  That's correct.  Apparently there

14:21:43  12  was some statement made to his -- in one of the foster homes

14:21:47  13  that he was in to a foster brother about something, but I'm not

14:21:52  14  exactly sure what the statement was.  Mr. Hart may be able to

14:21:54  15  clarify that.  But it's certainly not something that has ever

14:21:59  16  been, again, corroborated.

14:22:01  17            I've talked to the family extensively about the

14:22:04  18  idea of whether or not there was ever a niece that he could

14:22:06  19  have had sex with, and there is no niece that he could have

14:22:10  20  ever had any kind of sexual relationship with.

14:22:13  21            I would say that my client in this case, I think,

14:22:17  22  is a little unusual in that it seems that he came from a fairly

14:22:22  23  happy family and lifestyle.  He obviously had some sexual

14:22:27  24  encounters at a very early age, perhaps earlier than some, and

14:22:31  25  I think sex has been an interest of his, perhaps to a greater

14:22:38  1    extent in terms of his fantasies and things like that.  For

14:22:42  2    example, he admittedly had an interest in bondage, which for

14:22:50  3    some would be a little bit of a taboo or odd sexual practice.

14:22:54  4    But for many it's, apparently, something that goes on.  And

14:22:59  5    there's certainly nothing illegal about it, again unless it

14:23:03  6    involves children.

14:23:05  7              But the defendant has also gone through a lot

14:23:11  8    of -- some serious emotional problems, as I pointed out in my

14:23:14  9    memorandum, at the time.  He had been in a bad relationship

14:23:19 10    with the son's mother.  She's currently incarcerated, related

14:23:23 11    to narcotics.  One of the reasons that Gary had his son in the

14:23:27 12    first place is because she was incapable of taking care of the

14:23:30 13    child, and Gary and his grandmother, who's present in the

14:23:35 14    courtroom and the other members of the family, who are all

14:23:38 15    still supportive of him, his brother and his sister are here in

14:23:41 16    the courtroom today, they all assisted in that regard.

14:23:45 17              Gary loves his son very dearly, Your Honor, and

14:23:53 18    recognizes that this was an abuse, that it was something that

14:23:57 19    never should have happened, it was childish.  If you actually

14:24:02 20    saw the video or the still images or whatever, you'd see that

14:24:06 21    it's very childish, immature, irrational behavior by an adult

14:24:12 22    male with any child, let alone your own son.  And Gary

14:24:17 23    recognizes that.

14:24:19 24              He -- as I said before, when Gary pled this case,

14:24:25 25    he pled to both charges without the benefit of a plea

14:24:28  1   agreement, because I think at the time he really didn't care

14:24:31  2   what this court did to him.  So a lot of the arguments that

14:24:35  3   I've made in here are my arguments to try to save this man

14:24:39  4   because I believe that this case is different, very different,

14:24:45  5   than what I think you would typically see in a production type

14:24:51  6   of case or what I expected you'd see in a production-type case.

14:24:55  7   And maybe that was because I was somewhat naive about what

14:24:58  8   production was going to involve.  But I expected it would

14:25:02  9   involve many of the things where we see children that have been

14:25:05  10  kidnapped around the world and some of them abused and tortured

14:25:10  11  and then discarded and terrible things have happened to them,

14:25:13  12  and then there --

14:25:14  13       THE COURT:  We seldom get jurisdiction over those

14:25:16  14  defendants in this country.

14:25:17  15       MR. GRADERT:  That's true, Your Honor, we don't.

14:25:19  16  And we'll probably never be able to find some of those people,

14:25:22  17  and many of those things were made so long ago that we'll never

14:25:25  18  find the people that have done them.

14:25:27  19       There's no question that the minor child in this

14:25:31  20  case was -- is a victim.  My client is not claiming to be a

14:25:37  21  victim in this.  I think he knows that he's victimized himself,

14:25:42  22  so to speak, by allowing this to happen, and he knows he's

14:25:45  23  going to pay the price, but the ultimate price for Gary Hibler,

14:25:49  24  Your Honor, has really been the loss of his son.  I mean, I

14:25:52  25  cannot begin to tell you -- and you may see it here today if

14:25:56   1   Gary speaks -- the emotion that comes out of him when we talk

14:25:59   2   about his son and what he's done and how he's lost him.  And

14:26:03   3   it's affected the entire family.  They feel like they've lost

14:26:07   4   Gary for many, many years, no matter what sentence the Court

14:26:13   5   imposes in this case.

14:26:14   6          You know, a long time ago when I was a state

14:26:20   7   public defender I did a lot of contact-type sex offenses, from

14:26:25   8   rape to indecent liberties, incest-type cases, and my

14:26:33   9   recollection was that in the old days the psychologists and the

14:26:38   10  psychiatrists were saying that crimes like incest are a little

14:26:45   11  different than your average, your typical, pedophile who may

14:26:51   12  very well seek out strangers and molest children that they

14:26:55   13  don't even know.  Incest is a little bit different creature in

14:27:01   14  that it's kind of a crime of opportunity, because the children

14:27:05   15  are in the home, or the relative or whatever.  And it's

14:27:12   16  interesting but they used to say that those types of people

14:27:16   17  were much more amenable to treatment because it was, again,

14:27:20   18  that crime of opportunity rather than one where they're going

14:27:24   19  to go out and seek other children.

14:27:26   20         And Mr. Hart may disagree with me on that.  He

14:27:28   21  disagrees with a psychologist, who also has a law degree, in

14:27:33   22  this regard.  And I'm not here to try to say that I'm a

14:27:36   23  psychologist or can second-guess these people.  They do testing

14:27:39   24  that I don't understand or know about, but I would submit that

14:27:42   25  in this particular case that Dr. Flesher's assessment is a

| | | |
|---|---|---|
| 14:27:45 | 1 | fairly accurate one.  This man is not a man who's likely to |
| 14:27:49 | 2 | reoffend. |
| 14:27:49 | 3 | THE COURT:  But there's more to sentencing, |
| 14:27:51 | 4 | Mr. Gradert, than just preventing reoccurrences.  There's also |
| 14:27:57 | 5 | the -- what society has determined are appropriate levels of |
| 14:28:00 | 6 | punishment for conduct, even if there's no chance of |
| 14:28:02 | 7 | reoffending. |
| 14:28:03 | 8 | MR. GRADERT:  That's true, Your Honor.  And, |
| 14:28:07 | 9 | obviously, the laundry list of things that are involved in |
| 14:28:10 | 10 | 3553(a) are to look at the history and characteristics of the |
| 14:28:16 | 11 | defendant and the nature of the crime, to look at appropriate |
| 14:28:21 | 12 | sentences, to promote respect for the law, to prevent other |
| 14:28:29 | 13 | people from committing these kinds of crimes, and to prevent |
| 14:28:32 | 14 | the defendant from committing these kinds of crimes.  And all I |
| 14:28:36 | 15 | can say, Your Honor, is these sentences are all long.  You |
| 14:28:40 | 16 | know, obviously -- even 15 years, as I've said in my sentencing |
| 14:28:45 | 17 | memorandum, is a long, long, long sentence. |
| 14:28:47 | 18 | I can remember when I first came to the federal |
| 14:28:49 | 19 | court, I'd never had anybody that had been sentenced to more |
| 14:28:53 | 20 | than about ten years, and for years it pained me to have |
| 14:28:56 | 21 | somebody that was getting 10 years or 15 years, and now we're |
| 14:28:59 | 22 | seeing 20- and 30- and 40-year sentences.  And I hope I don't |
| 14:29:06 | 23 | see too many of those in my life, but certainly those kinds of |
| 14:29:10 | 24 | sentences send a message to the public. |
| 14:29:12 | 25 | But I don't think that anything that happens to |

14:29:16   1   this defendant is probably going to stop people from doing this

14:29:19   2   kind of thing.  It hasn't stopped a lot of 'em, even though

14:29:23   3   we've had a whole rash of these lately, because people are in

14:29:26   4   the privacy of their own homes, they think that they're

14:29:29   5   invincible from this kind of stuff, and they don't realize that

14:29:32   6   other people are watching them and that they can be found

14:29:36   7   fairly easily.

14:29:38   8          I would submit that the primary statement of

14:29:44   9   sentencing in 3553 is that the Court's supposed to fashion a

14:29:51   10   sentence that is not greater than necessary to achieve the

14:29:56   11   purposes of sentencing.  And I just would submit that 292

14:30:02   12   months is too great in this case.

14:30:06   13          I recognize that the reason that my client is

14:30:09   14   higher than any of the other defendants who have been sentenced

14:30:12   15   previously for this type of offense is because his prior

14:30:15   16   criminal history, because most of the time in child

14:30:18   17   pornography-related cases the defendants have never been in any

14:30:22   18   trouble in their lives before.  The -- although there are a few

14:30:26   19   who have had prior sexual contact offenses and prior offenses

14:30:30   20   of that nature.

14:30:31   21          My client's convictions are not of that nature.

14:30:34   22   They were worthless checks and a domestic violence battery and

14:30:39   23   an assault on a law enforcement officer that arose out of the

14:30:44   24   domestic incident.  And I've been told by the family members

14:30:48   25   that what happened in that was that my client was trying to

3-25-11   USA v. HIBLER   10-10137

16

14:30:51  1   leave the scene where he'd been in an argument with his son's

14:30:57  2   mother, was trying to take the child away and sped out of the

14:31:01  3   driveway.  And as he backed up, he nearly hit a law enforcement

14:31:04  4   officer, and that's why he was charged with this.

14:31:07  5         So I guess -- I didn't file a formal objection

14:31:12  6   suggesting this, but I would say that his criminal history

14:31:14  7   category is somewhat overrepresentative, slightly

14:31:18  8   overrepresentative, which kicks him into that higher category

14:31:20  9   of criminal history category two, with those being the kinds of

14:31:24  10  crimes and the length of time or the age of those convictions,

14:31:27  11  that the Court could also take into consideration in terms of

14:31:30  12  fashioning an appropriate sentence.

14:31:32  13        But, again, and I don't know all the specifics of

14:31:36  14  those other sentences, Your Honor, and why they got the

14:31:39  15  sentences that they received, but they were all at about 262

14:31:45  16  months for the most part, and my client's looking at more time

14:31:49  17  than that and I'm telling the Court that this is not even the

14:31:51  18  worst kind of production case that I've ever seen.

14:31:55  19        THE COURT:  Well, your client's only looking at

14:31:57  20  more time than that, as you acknowledge, because of the

14:32:01  21  criminal history.  I mean, he's at an offense level that would

14:32:05  22  calculate 262 months if he were in a criminal history category

14:32:08  23  one.

14:32:08  24        MR. GRADERT:  That's correct, Your Honor.  We're

14:32:10  25  not challenging the calculations of the sentencing guidelines.

14:32:12  1   Again, the language that we've run with for many years with

14:32:17  2   these sentencing guidelines is whether it's within the

14:32:19  3   heartland of cases, and what I'm trying to do here in this case

14:32:24  4   and what I believe the facts present in this case is to show

14:32:27  5   that this case is different from the heartland of these kinds

14:32:31  6   of cases, even though we don't have a lot of sampling to choose

14:32:35  7   from. And I'm hoping that the Court will consider giving him a

14:32:37  8   lesser sentence.

14:32:38  9           You know, he's 46 years old. And if he gets a

14:32:43  10  20-year sentence, he'll be almost 70 years old when he gets

14:32:48  11  out. And I don't know if you've seen any of these studies,

14:32:51  12  Your Honor, because I didn't include anything like that in this

14:32:54  13  particular sentencing memorandum, but there are a number of

14:32:59  14  studies that would indicate that in this area of offense, that

14:33:03  15  the recidivism rates reduce dramatically the older you get.

14:33:07  16  And I think that's generally true of crime in general. And

14:33:11  17  they're very, very, very low.

14:33:13  18          And so, once again, you know, one of the primary

14:33:16  19  purposes of sentencing is the protection of society, but as

14:33:19  20  Dr. Flesher pointed out in his report, he did not believe that

14:33:22  21  that needed to be as big a part of the equation in this as,

14:33:26  22  perhaps, maybe just whatever the Court determines is an

14:33:29  23  adequate punishment for the offense and retribution for the

14:33:35  24  offense. And I would submit that, you know, anything the Court

14:33:38  25  gives him is going to be more than adequate, in my opinion, as

14:33:43  1   lengthy as these sentences are, but I hope the Court will

14:33:47  2   consider giving him a much lower sentence than what the

14:33:49  3   guideline calls for.  Thank you.

14:33:50  4            THE COURT:  Mr. Gradert, I agree that these are --

14:33:55  5   these are long sentences.  These are the types of sentences

14:33:58  6   that when you look at calculations or guidelines that, even for

14:34:02  7   people like you and I who have been who have been familiar with

14:34:05  8   these, that takes your breath away.  It's extraordinarily long

14:34:09  9   sentences.  The thing I struggle with on your request is you've

14:34:13 10   said several times that this isn't the worst of these types of

14:34:19 11   offenses.  And no one's talking about sentencing him at the top

14:34:22 12   of the statutory maximum, but I have to look at -- and I have

14:34:28 13   to give great weight to how Congress has structured the

14:34:32 14   sentencing range for these, and to sentence him at the

14:34:35 15   statutory minimum would be, it seems to me, implicitly to say

14:34:40 16   that this is the minimal type of conduct that would occur under

14:34:43 17   a production charge, I guess with a parent, as that's the way

14:34:47 18   it's charged.

14:34:52 19            MR. GRADERT:  I think --

14:34:52 20            THE COURT:  And I struggle with that.  You know,

14:34:54 21   I'm not sure -- I've read the chats, the long chat line.  And

14:34:59 22   I've looked at those in this case, and I've spent a lot of time

14:35:02 23   looking at this case because of the severity of the sentence

14:35:05 24   that's involved, and I'm like you, I don't know how much of

14:35:09 25   what he says to believe.

14:35:11  1          I was inclined, even before you told me, that

14:35:13  2     there is no likely niece.  I was inclined to suspect that the

14:35:17  3     whole niece story was just huffing or braggadocio in that chat.

14:35:25  4     Not so much so to think about the sexual contact shower issues.

14:35:32  5     We don't know that that's true, but they didn't seem to me to

14:35:36  6     be as likely untrue as maybe the niece story was.

14:35:39  7          But the piece that I can't get around is it's

14:35:43  8     clear to me that Tish or Trish, who we all now know is a guy,

14:35:49  9     clearly wanted to see images of a minor child.  And it's clear

14:35:54  10    to me that your client clearly just wanted to get into bed with

14:36:00  11    Tish.  And it seems pretty clear to me that he was perfectly

14:36:03  12    willing to trade his son up in order to get between the sheets

14:36:08  13    with Tish, to shoot images of his son, to have his son engage

14:36:13  14    in sexual contact with Tish's daughter, to have his son engage

14:36:17  15    in sexual contact with Tish, to do whatever Tish wanted, or

14:36:21  16    Trish, whatever she wanted with respect to the son just so he

14:36:27  17    could get in bed with her.

14:36:28  18          So I have trouble saying that that's the minimum

14:36:33  19    level of conduct in these types of cases.

14:36:37  20          MR. GRADERT:  That is what I was saying,

14:36:39  21    basically, Your Honor, that it is the minimum type of conduct,

14:36:43  22    because what I'm talking about is just the actual production

14:36:46  23    itself --

14:36:46  24          THE COURT:  Well, but it all relates --

14:36:48  25          MR. GRADERT:  -- not the surrounding circumstances.

14:36:50  1    THE COURT:  I don't think you can do that.  It all

14:36:51  2    relates.

14:36:52  3    MR. GRADERT:  I think the Court's made a good

14:36:54  4    point.  And, again, I'm shooting for the moon here, Your Honor.

14:36:59  5    I don't know what the Court's going to do, but I appreciate the

14:37:01  6    fact that the Court does recognize and understand that these

14:37:06  7    sentences are at a dramatically high level, and that in this

14:37:10  8    particular case I do not believe or submit that this defendant

14:37:16  9    shouldn't receive a sentence even at the low end of the

14:37:20  10   guideline as calculated, because it is so high.

14:37:23  11   And, granted, it is lower than the statutory

14:37:27  12   maximum.  And that's one of the problems that we argue about,

14:37:33  13   with regard to the possession and distribution and receipt

14:37:38  14   cases, is oftentimes what happens in those cases is that the

14:37:42  15   guidelines end up coming out at about the mandatory maximums

14:37:47  16   for those, which is one reason why we didn't think they were

14:37:50  17   very well thought out, because we don't think that the

14:37:52  18   guidelines should necessarily start at the highest levels

14:37:56  19   available under the statutory sentencing scheme.  And,

14:38:04  20   obviously, Congress did believe there were some production

14:38:07  21   cases that would warrant a 15-year sentence.

14:38:09  22   THE COURT:  The minimum ones?

14:38:10  23   MR. GRADERT:  The minimum, yes.  But I do

14:38:15  24   recognize that some of the problems in this case that the Court

14:38:17  25   has brought up and as I indicated it does make it somewhat

14:38:20  1    different in that it is a parent/child relationship.  But

14:38:25  2    that's all I have.

14:38:25  3                    THE COURT:  All right.  Thank you, Mr. Gradert.

14:38:26  4                    Mr. Hart.

14:38:39  5                    MR. HART:  Thank you, Your Honor.

14:38:42  6            I hope not to be all over the map in my arguments,

14:38:48  7    and if I may address just some of the things that defense

14:38:51  8    counsel has raised in the course of their oral arguments.

14:38:54  9            With regard to the last statement regarding the

14:38:58  10   guidelines and how possession and distribution and production

14:39:03  11   interrelate, in the District of Kansas our sentences for

14:39:08  12   distribution and receipt are actually not ending up at the

14:39:12  13   upper end of the guidelines range; they're generally right in

14:39:15  14   the middle, they're in that middle third.  There's only been a

14:39:19  15   couple of instances when they go up to the top.

14:39:21  16           With regard to possession, they're likewise

14:39:25  17   generally in the middle, but there are some of those that go up

14:39:28  18   towards the top.  And there's a reason for that.  It's because

14:39:31  19   here in Wichita they frequently charge receipt or distribution

14:39:35  20   but pled them to possession, thus the offender hit a number of

14:39:40  21   enhancements which made it appear that they were at the top of

14:39:46  22   the end.  So these arguments that the guidelines are

14:39:47  23   constructed inappropriately so as offenders are always at the

14:39:52  24   upper end is incorrect, at least as far as this district goes.

14:39:56  25           And when we look at this particular case, that

14:39:59   1    argument also fails because this defendant ends up in sort of

14:40:03   2    the middle part of the range, there where most other offenders

14:40:08   3    fall.  It's by virtue of his criminal history that he escalates

14:40:11   4    a little bit further up.

14:40:14   5            As I outlined in my memorandum, there's reasons

14:40:17   6    why the defendant's score is much higher than it might

14:40:22   7    otherwise be, and that's because he engaged in certain aspects

14:40:26   8    that make this more egregious:  The age of the child being one;

14:40:30   9    there's distribution involved; his status as a parent affects

14:40:34   10   all this as well.  And if we were to think in terms of what

14:40:37   11   might be sort of the bottom end of child pornography in this

14:40:43   12   context, that would be more like the picture of a 16-year-old

14:40:46   13   that is not distributed.  That would be something that would

14:40:50   14   put somebody closer to the statutory minimum, and would be sort

14:40:54   15   of in line with Congress' view of, well, that's not necessarily

14:40:57   16   as bad as preying upon younger children.

14:41:01   17           THE COURT:  Let me just say, Mr. Hart -- and I say

14:41:03   18   this with reference to my prior job -- I really hope your

14:41:13   19   office doesn't bring me child porn cases involving 16- or

14:41:17   20   17-years-olds.

14:41:18   21           MR. HART:  Absolutely, absolutely, Your Honor.

14:41:20   22   And Mr. Gradert is actually in a unique position where we had

14:41:23   23   one of those where we had a person who had taken pictures of a

14:41:26   24   17-year-old, we found them but we retained him as distribution

14:41:29   25   but pled him at something at about 14-and-a-half years.  So we

14:41:34  1   are undertaking to avoid charging those cases.  But I would

14:41:37  2   submit, in terms of figuring out where Congress is at, that

14:41:40  3   type of behavior's no less wrong; it's just less likely to be

14:41:44  4   prosecuted.  In this case we're not dealing with those set of

14:41:49  5   circumstances.  What we're dealing with is a very, very tragic

14:41:53  6   set of circumstances, and it's made more tragic by virtue of

14:41:56  7   the context in which the minor child fits in.

14:42:00  8            In this case the minor child has two parents, one

14:42:04  9   of which is unable to care for him by virtue of being

14:42:08  10  incarcerated and involved in drugs.  And that's -- that is

14:42:13  11  absolutely tragic, and that's referenced in the defendant's

14:42:15  12  motion.  And what I would submit to the Court is that really

14:42:19  13  kind of ups the ante on the father to step up and take care of

14:42:23  14  his child, but that's not what we have in this case.  In this

14:42:27  15  case, as the Court noted, we had a trade offer occur, by the

14:42:34  16  defendant putting forth his son, throwing his son under the

14:42:37  17  bus, essentially, in order to advance his goal of getting to

14:42:40  18  have sex with Trish.  And I would note that in the chats it's

14:42:43  19  not just getting to have sex with Trish; it's also getting to

14:42:47  20  have sex with Sarah.  And so we have sort of this notion of

14:42:51  21  "I'll show you mine if you show me yours."  And we have a trade

14:42:55  22  going on.

14:42:56  23            And I would -- I think that does qualify as more

14:43:01  24  egregious conduct because it's not just good old fun; this was

14:43:06  25  I'm trying to perpetuate another crime, which is raping another

14:43:11   1   small child, and that is the context in which this offense

14:43:15   2   conduct occurs.

14:43:16   3            The notion that this was just -- that this is not

14:43:20   4   his idea or it's mere fantasy or he's somehow tricked ignores

14:43:25   5   the defendant's own history of involvement on the Internet.

14:43:31   6   His own history shows that he has contacted and met people on

14:43:36   7   the Internet.  He even got engaged to one, that being his

14:43:39   8   fiance.

14:43:40   9            THE COURT:  With adults.

14:43:41   10            MR. HART:  Absolutely, those are adults.  That

14:43:44   11   particular adult, a 23-year-old.  Well, in this case he's

14:43:47   12   talking to a 22-year-old.

14:43:48   13            Now, the notion that he's just engaged in fantasy

14:43:51   14   is belied by the fact that he's previously met somebody and

14:43:54   15   even got engaged with them that's roughly the same age as the

14:43:58   16   person he's talking to right now.

14:43:59   17            THE COURT:  Well, let me make sure I understand

14:44:01   18   your argument.  I don't think any of us doubt that he was

14:44:08   19   seriously wanting to pursue a sexual relationship with the

14:44:12   20   22-year-old Tish.  I have some question as to how interested he

14:44:17   21   was in having sex with her daughter, whether it was just Tish

14:44:21   22   saying, "I want to have sex with your son and you could have

14:44:24   23   sex with my daughter" and he was saying yes to anything as long

14:44:27   24   as it would get him between the sheets with Tish.  I don't know

14:44:30   25   how to assess that.  But I don't think this it's any

| | | |
|---|---|---|
| 14:44:33 | 1 | enhancement to this conduct that he was doing what millions of |
| 14:44:39 | 2 | law-abiding people have done, and that is meet significant |
| 14:44:42 | 3 | others over the Internet. |
| 14:44:43 | 4 | MR. HART:  Absolutely. |
| 14:44:44 | 5 | THE COURT:  And so I'm reluctant to see your point |
| 14:44:47 | 6 | on that, Mr. Hart. |
| 14:44:48 | 7 | MR. HART:  No, and, Your Honor, I'm not going down |
| 14:44:50 | 8 | that road to say it's an enhancement.  What I'm saying is it's |
| 14:44:53 | 9 | not mitigation.  This is not -- |
| 14:44:54 | 10 | THE COURT:  I'm not sure it's relevant, I guess is |
| 14:44:57 | 11 | what I'm saying, with respect to just he and Tish or Trish. |
| 14:45:00 | 12 | MR. HART:  Well, and in respect to he and Tish, I |
| 14:45:02 | 13 | would agree, that is not -- that only becomes part of the |
| 14:45:07 | 14 | equation if the Court were to go down the road of, well, I |
| 14:45:11 | 15 | think this may have been fantasy and he wasn't really thinking |
| 14:45:13 | 16 | it was going to happen, and I would submit he really |
| 14:45:16 | 17 | was wanting -- |
| 14:45:16 | 18 | THE COURT:  No, he really wanted to get between |
| 14:45:17 | 19 | the sheets with Trish.  I don't doubt that for a second. |
| 14:45:20 | 20 | MR. HART:  And with regard to having sex with |
| 14:45:22 | 21 | Sarah, the purported minor daughter of Trish, I would say that |
| 14:45:27 | 22 | there is indication that that is his -- that he's also |
| 14:45:30 | 23 | interested in that, based upon the collection of child |
| 14:45:33 | 24 | pornography that he had, the fact that he's engaged in other |
| 14:45:36 | 25 | chats involving having sex with five-, six-, seven-year-olds, |

14:45:40  1   other chats where he says he's had sex with his nine-year-old

14:45:44  2   niece and the neighbor children.

14:45:46  3           So the context of, "yes, I definitely want to have

14:45:49  4   sex with you," I think it also correlates to, "yes, I

14:45:52  5   definitely want to have sex with your daughter."  And I think

14:45:57  6   that is also supported by the notion of he actually brings his

14:45:59  7   minor child in as sort of a showing of good faith in making the

14:46:04  8   trade to get this to happen.  I don't think the defendant could

14:46:08  9   possibly have thought that there was not, in fact, a minor

14:46:12  10  female on the other end of this trade.

14:46:16  11          So that is sort of the context in which the

14:46:19  12  defendant's conduct occurs.  While there was reference to

14:46:25  13  incest, and incest is part of the defendant's stock in trade;

14:46:32  14  there were pornography magazines that were, you know, "family

14:46:36  15  affair" and things like that, so I think there is legitimately

14:46:40  16  some interest in incest.  But in the context of this, the

14:46:44  17  defendant's interest is not in incest; it's actually in having

14:46:48  18  sex with the other person and their minor daughter.  So in

14:46:53  19  terms of risk calculation, while we may sit here and think,

14:46:55  20  well, incest is opportunistic, we're not just dealing with

14:46:59  21  incest in this case.

14:47:02  22          Now, those things being said, I would agree that

14:47:10  23  this case is not the typical case by virtue of the way the

14:47:15  24  conduct is discovered, because this is live streaming video

14:47:20  25  which we would never ever have discovered but for the fact

14:47:22  1    someone else recorded it.  And that is alarming to the

14:47:26  2    Government because we have no real idea of knowing how

14:47:30  3    frequently it might have occurred.

14:47:32  4            This sort of evidence is not recorded on the

14:47:34  5    defendant's computer.  It only shows up on the other person's

14:47:38  6    computer because they used a special program to record it.  So

14:47:41  7    we really are kind of at a question mark as to whether or not

14:47:45  8    it ever occurred at any other time.  And I can't tell you that

14:47:48  9    it did.  I also can't tell you that it didn't.  All that we are

14:47:51  10   focused on is we found it at this point in time, and based upon

14:47:55  11   his conduct, he's now looking at that guidelines range of 292

14:47:59  12   to, I believe, 360 by virtue of the statutory maximum.

14:48:05  13           In this context I think it is appropriate, as I've

14:48:09  14   outlined in my motion or my response, the fact that he's a

14:48:13  15   parent, that he distributes, that he is involved in kind of

14:48:19  16   getting his son to get engaged in the process, he's a full

14:48:24  17   player in this whole endeavor.  And while Trish absolutely is

14:48:28  18   encouraging and kind of trying to move that thing along, the

14:48:33  19   defendant was in the position to say, "no, I'm not interested

14:48:36  20   in that."  And that would have been the appropriate response.

14:48:39  21   And that definitely would have been the appropriate response if

14:48:41  22   he was that concerned about the welfare of his minor child.

14:48:45  23   But he wasn't.  He was more interested about getting his

14:48:50  24   prurient interest satisfied, and in the course of doing that,

14:48:54  25   threw his son under the bus.

14:48:56   1      As we look at the defendant's request for a

14:49:05   2   variance, I mean, we're essentially proceeding under the

14:49:08   3   3553(a) factors.  And as I review it, there does not appear to

14:49:13   4   be anything that is particularly moving or compelling about the

14:49:18   5   defendant's circumstances to motivate the Court to give him a

14:49:22   6   variance, considering his conduct.

14:49:24   7      We have an interest in -- we are presented with a

14:49:27   8   defendant who has an interest in all kinds of unusual sexual

14:49:33   9   interests, including bestiality and bondage and incest and

14:49:37   10   child pornography.  I would submit to the Court that particular

14:49:41   11   individual does not present an individual that is likely to be

14:49:49   12   amenable to treatment.  This is an individual that has some

14:49:54   13   serious, serious issues.  And I don't know where they arise

14:49:58   14   from or where they are going to go, but that's what the Court

14:50:03   15   is presented with.

14:50:04   16      In terms of the effects on his family, absolutely

14:50:07   17   there's effects on his family.  But I would encourage the Court

14:50:10   18   to remember that the biggest effect is on the minor child.  And

14:50:16   19   when we think about the length of these sentences, they're

14:50:19   20   absolutely very long, but that is absolutely appropriate given

14:50:23   21   the nature of what is occurring.  When these minor children are

14:50:26   22   victimized, they are sentenced to a life sentence.  They're not

14:50:30   23   sentenced to 20 years and then they're done with the issue.

14:50:33   24   They're not sentenced to 15 and then they're done.  They have

14:50:35   25   to deal with it for the rest of their lives.  And it's not by

14:50:39  1   any choice that they made; it's by the choices of the people

14:50:42  2   that are the adults around them or the people that are supposed

14:50:45  3   to be protecting them.

14:50:46  4        So when we think about, well, golly, this is a

14:50:49  5   really long time, well, it's supposed to be.  If we compare it

14:50:55  6   to homicides, it's kind of apples and oranges.  Homicides are

14:50:59  7   frequently isolated incidents, single occurrence, and not

14:51:02  8   likely to occur again.  To the extent that they are serial

14:51:07  9   killers, those frequently have some sort of deviant sexual

14:51:11  10  component to them that causes them to do it over and over

14:51:13  11  again.

14:51:14  12       Well, if we look at folks that are involved in

14:51:17  13  weird stuff sexually and we're comparing it to homicides, well,

14:51:20  14  let's compare the apples to the apples, and what we're faced

14:51:24  15  with is something that's a little bit more frightening and may

14:51:27  16  motivate us to think, yeah, deviant sexual behavior does

14:51:31  17  deserve a bigger sentence.  But that's all irrelevant.  It's

14:51:35  18  not for us to debate, well, golly, homicide's bad and this is

14:51:39  19  somehow less bad.  It's all bad.  And Congress has determined

14:51:42  20  an appropriate sentence that reflects how bad it is.  And I

14:51:45  21  would encourage the Court to follow the guidelines as they've

14:51:52  22  been established by the sentencing commission and impose a

14:51:55  23  sentence within the guidelines.  I think 292 is appropriate.

14:52:00  24       If the Court -- what I would submit is this.  If

14:52:03  25  the Court were to vary, I think that ultimately goes to

14:52:08  1    undermining our understanding of where this type of offender

14:52:12  2    falls in the guidelines and according to what their offense

14:52:16  3    conduct is, because the only thing that the defendant doesn't

14:52:19  4    do is some sort of violent act against the minor child.  And if

14:52:24  5    that's the yardstick we use, then I think we've kind of lost

14:52:27  6    our compass.  We're not giving ourselves -- well, we're not

14:52:31  7    treating the victims of things less than that in the

14:52:34  8    appropriate way that we should.

14:52:36  9                    Thank you, Your Honor.

14:52:37  10                   THE COURT:  Mr. Gradert talked about criminal

14:52:39  11   history.  Do you want to say anything about that?

14:52:44  12                   MR. HART:  With regard to -- as I understood the

14:52:47  13   argument, it was a suggestion that the Court should not apply

14:52:50  14   the criminal history, for some reason.  And I wasn't quite

14:52:55  15   clear what the reason was.

14:52:56  16                   THE COURT:  It was a brief reference, I'll agree.

14:52:59  17                   MR. HART:  And I kind of interpreted it as the

14:53:02  18   suggestion that, well, because it's not directly related to

14:53:05  19   some sort of sex offense, we shouldn't use that to sort of ramp

14:53:10  20   him up over here.  And I don't think that's at all appropriate.

14:53:13  21   If you engage in criminal conduct, you have earned the -- your

14:53:20  22   place in the history calculation.  You don't get to, by virtue

14:53:26  23   of committing a new sex offense, manage to avoid having your

14:53:30  24   prior crimes of robbery or aggravated assault on a law

14:53:35  25   enforcement officer somehow ignored.  If we were to flip it

14:53:39  1    around, it would be sort of like an individual who goes and

14:53:42  2    robs a bank would somehow not have their prior sex offense

14:53:46  3    counted in their criminal history calculation.  And if we kind

14:53:49  4    of follow that track, it just would result in all kinds of

14:53:52  5    problems.

14:53:52  6            So the notion that we don't apply this -- we don't

14:53:56  7    use this offense to calculate his criminal history, one, I

14:54:00  8    don't know how the Court could do that, and, two, I don't think

14:54:03  9    the Court should do that.

14:54:06  10           THE COURT:  All right.  Thank you, Mr. Hart.

14:54:08  11           Mr. Gradert, do you have any --

14:54:13  12           MR. GRADERT:  Your Honor, I think my client would

14:54:14  13   like to make a statement.  The only thing I would like to say

14:54:17  14   that I probably failed to state before is that one of the

14:54:21  15   problems with what we're doing here is we're focusing on just

14:54:24  16   the crime itself, and we're not really taking a look at the

14:54:27  17   entire history of the man himself.

14:54:31  18           And this case and this incident that caused him to

14:54:37  19   be here is not everything there is to Gary Hibler.  And, of

14:54:41  20   course, the nature and characteristics and history of the

14:54:44  21   defendant, I think, are important.  And although Gary does have

14:54:48  22   a prior criminal history, it's somewhat remote, it's not

14:54:52  23   related to this type of an offense, it was -- arose out of a

14:54:57  24   domestic situation, a bad domestic situation, that got him two

14:55:01  25   criminal history points, which caused him to get into a higher

14:55:04  1  criminal history category.  And I understand that that's how

14:55:06  2  the guidelines work.

14:55:07  3            But Gary Hibler's been a businessman.  He's been

14:55:12  4  otherwise a good father.  He was planning on, you know, sending

14:55:15  5  his son to college someday, wanted a better life for him, like

14:55:19  6  most of us as parents do.  He's been good to his other family

14:55:23  7  members.  I don't think there have been real problems with him

14:55:27  8  in the overall community.  It's been something very isolated,

14:55:32  9  and it's -- I sometimes look at it like he's going to pay the

14:55:36  10  ultimate price for basically one mistake.  And I know that

14:55:42  11  happens sometimes, it happens to people.  But in looking at

14:55:46  12  what's appropriate for him, I would ask the Court to just take

14:55:49  13  a look at Gary Hibler, the man, beyond just what's happened in

14:55:57  14  this case itself.

14:55:58  15            And I think Mr. Hibler had some comments, Your

14:56:00  16  Honor.

14:56:01  17            THE COURT:  Mr. Hibler, before I announce a

14:56:03  18  tentative sentence on defendants I always want to give them an

14:56:07  19  opportunity to make any statement if they want to the Court.

14:56:09  20  You're not required to.  But if you have anything you'd like to

14:56:11  21  say for my consideration, I'd be interested to hear you.

14:56:16  22            THE DEFENDANT:  Yes, Your Honor.

14:56:16  23            THE COURT:  And this would be your opportunity to

14:56:18  24  do that.  And you can address me from the table or however you

14:56:22  25  want to proceed, wherever you want to go.

14:56:24  1          THE DEFENDANT:  To start with, what I did was

14:56:36  2     inexcusable and it's caused a lot of problems for my family,

14:56:53  3     for my friends, for my customers and my employees.  I want to

14:57:07  4     apologize, first to the Court, having to go through this.

14:57:15  5     Secondly, to my customers, for the customers that I had

14:57:20  6     contracted and worked -- do work for that had to find somebody

14:57:26  7     else, for the customers that I've -- loyal customers that I've

14:57:29  8     had for years that are in the situation of having to find

14:57:33  9     somebody new, not only qualified to do the work but find

14:57:41  10    affordable local work.

14:57:46  11          I want to apologize to a couple of groups that I

14:57:53  12    had pledged financial and labor support to this last winter,

14:57:58  13    Heartland Heroes and the All-American Beef Battalion, for not

14:58:07  14    being able to uphold the pledges that I made to them last

14:58:10  15    summer.

14:58:25  16          I owe a really big apology to my family, because

14:58:48  17    I've let 'em down and brought shame on them because of my

14:58:56  18    actions.  They've stood behind me when they didn't have to, and

14:59:15  19    I appreciate that.  And most of all I want to apologize to my

14:59:27  20    son.  Because of my stupidity, he's got to live with what I've

14:59:38  21    done and the pain that I've caused him, and that's inexcusable.

14:59:50  22          THE COURT:  Thank you, Mr. Hibler.

14:59:59  23          These are always tough cases.  Mr. Gradert noted

15:00:05  24    that there haven't been any that he recalled, production cases,

15:00:09  25    in Wichita before.  And I don't know but what that may be

15:00:12  1    right.  I hadn't thought of that before.  Obviously, from my

15:00:15  2    prior contact, I've been involved with production cases.

15:00:21  3                I recounted at the beginning that when you look at

15:00:24  4    the sentences that are calculated with the guidelines in these

15:00:28  5    matters, they take your breath away.  But when you look at the

15:00:34  6    facts in these cases, they take your breath away, too.

15:00:41  7    Congress has set a range of sentences that they think are

15:00:48  8    appropriate in this case or these types of cases.  And I can't

15:00:55  9    say that the range is wrong.  And, frankly, it's not even my

15:00:59  10   position to say that the range is wrong.  My job is to follow

15:01:03  11   the laws that the Congress enacts, whether I agree with them or

15:01:10  12   not, and I can't say that I disagree with the range that

15:01:12  13   they've set in this case.  They're breath-taking sentences, but

15:01:17  14   they're breath-taking facts.

15:01:20  15               The problem I have, as I discussed during

15:01:27  16   Mr. Gradert's argument, the problem I have with Mr. Gradert's

15:01:30  17   request is that within that parameter, that it's my job to

15:01:34  18   apply the law and the sentences as created by the United States

15:01:38  19   Congress, I agree with Mr. Gradert's argument that these are

15:01:44  20   not the worst of the types of offenses, but I also don't think

15:01:47  21   they're the minimum.  I think if I am to give meaning and

15:01:52  22   effect to the sentencing range and the statute, that the

15:01:56  23   minimum sentence should only be appropriate for the minimum

15:01:59  24   offense conduct, and I don't think that this case qualifies as

15:02:02  25   a minimum-offense conduct.

| | | |
|---|---|---|
| 15:02:04 | 1 | I have no doubt that Mr. Hibler's statements that |
| 15:02:12 | 2 | he loved his son were genuine, but I am -- I am shook by the |
| 15:02:20 | 3 | fact that it was clear to me that he was willing to trade his |
| 15:02:24 | 4 | son for a sexual encounter with Trish, and there's just no |
| 15:02:28 | 5 | other way to look at that, as I read through the predicate |
| 15:02:31 | 6 | chats that led up to the event in question. |
| 15:02:38 | 7 | A good parent really sacrifices their own |
| 15:02:43 | 8 | interests in the favor of their child and certainly doesn't |
| 15:02:46 | 9 | serve their child up on some sort of an altar or some sort of a |
| 15:02:50 | 10 | child sacrifice to obtain what they want.  And it's unavoidable |
| 15:02:54 | 11 | to look at those chats and see that, knowing what we know now, |
| 15:03:02 | 12 | it's just obvious, in reading those chats, that Trish was far |
| 15:03:05 | 13 | more interested in the nine-year-old boy than she was in |
| 15:03:08 | 14 | Mr. Hibler, but I can certainly see at the time how that can be |
| 15:03:11 | 15 | overlooked, and Mr. Hibler was willing to deliver him up. |
| 15:03:17 | 16 | I don't give a lot of credence to his contacts |
| 15:03:20 | 17 | about his niece.  I don't know what to do about his contact -- |
| 15:03:23 | 18 | or his comments in his chats about actual contact he may have |
| 15:03:28 | 19 | had with his son in the shower.  I'm that sure whether I |
| 15:03:31 | 20 | believe or disbelieve it.  However, I don't doubt that had |
| 15:03:39 | 21 | Trish been what and who she said she was, and of course we all |
| 15:03:43 | 22 | know now that she was very different, he was very different, |
| 15:03:47 | 23 | and had they had contact and had Trish not only allowed sexual |
| 15:03:52 | 24 | contact with Mr. Hibler but then suggested that she have sexual |
| 15:03:56 | 25 | contact with his son, he would have agreed.  And if she would |

15:03:59  1   have suggested that he have -- that Mr. Hibler have sexual

15:04:02  2   contact with her daughter, I strongly suspect he would have

15:04:05  3   done that as well.  I don't think I have to stretch very far to

15:04:10  4   give credence to those comments, because he seemed to be

15:04:14  5   amenable to whatever she was suggesting.  So these clearly are

15:04:22  6   not minimum behavior under the statute, and I can't sentence

15:04:25  7   him that way.

15:04:32  8             And I acknowledge the truth of Mr. Hart's argument

15:04:41  9   that, sadly, the child has a life sentence.  I know, as many of

15:04:45  10  us do, too many adults who function well in life but who may

15:04:52  11  tell you of sexual abuse they incurred as a child 40 years ago

15:04:57  12  that still affects them and impairs them.  And whatever

15:05:00  13  sentence I were to give Mr. Hibler today is not as long as the

15:05:08  14  sentence that his son will have.

15:05:10  15            I can't say that the guideline calculation is

15:05:14  16  inappropriate for this case.  I do agree with Mr. Hart's

15:05:20  17  argument with respect to criminal history.  I think that the

15:05:24  18  guidelines envision that criminal history is not inappropriate

15:05:28  19  simply because it involves a different type of an offense than

15:05:32  20  the type of offense which the defendant's being sentenced and I

15:05:35  21  do believe that following that approach really wreaks havoc

15:05:43  22  with the guidelines.  I strongly agree with that argument.

15:05:47  23            But I'm troubled in this case because Mr. Hibler's

15:05:51  24  prior criminal history is based on conduct where, again, he was

15:05:56  25  sort of doing what he wanted rather than what he was required

| | | |
|---|---|---|
| 15:05:59 | 1 | to do, not with his son but with a law enforcement officer. |
| 15:06:05 | 2 | But in a bizarre way, his criminal history in this case, in a |
| 15:06:11 | 3 | twisted way, sort of reflects a concern for his son, because |
| 15:06:15 | 4 | the contact that he had with the law enforcement officer there, |
| 15:06:19 | 5 | although extraordinarily foolish and ill-advised and, |
| 15:06:23 | 6 | obviously, a child would have known that that was inappropriate |
| 15:06:29 | 7 | the way he did that, his contact with the law enforcement |
| 15:06:33 | 8 | officer, in the overall context, as I look at the broader |
| 15:06:37 | 9 | perspective, he was doing that really for his son.  So in this |
| 15:06:43 | 10 | case, while I agree categorically with Mr. Hart's arguments |
| 15:06:48 | 11 | regarding application of criminal history, in this case I have |
| 15:06:52 | 12 | to say that his criminal history may be overstated. |
| 15:06:55 | 13 | So the only thing I'm willing to do in this case, |
| 15:06:58 | 14 | and I am going to do this, is find that his criminal history |
| 15:07:02 | 15 | for these facts and for this defendant is overstated and, after |
| 15:07:08 | 16 | a lot of thought on this, apply a criminal history category of |
| 15:07:12 | 17 | I, but an offense level of 39 as calculated, which arrives at a |
| 15:07:17 | 18 | sentencing range of 262 to 327 months, and I intend to sentence |
| 15:07:21 | 19 | at the bottom end of that. |
| 15:07:22 | 20 | I would note that that puts this roughly midway |
| 15:07:27 | 21 | between the 15- to 30-year sentence Congress has provided, and |
| 15:07:30 | 22 | I think that's appropriate.  Mr. Hibler's conduct is by no |
| 15:07:34 | 23 | means the worst, but it's by no means minimum conduct in this |
| 15:07:37 | 24 | issue either. |
| 15:07:38 | 25 | So the tentative sentence of this court is going |

15:07:44  1    to be to impose, as to Count 1, a sentence of 262 months, as to

15:07:51  2    Count 2 a sentence of 120 months, that sentence to run

15:07:54  3    concurrently with the sentence in Count 1, for a controlling

15:07:57  4    sentence of 262 months; five years of supervised release on

15:08:05  5    both Counts 1 and 2, to run concurrently with each other, for a

15:08:11  6    controlling term of five years.  No fine or restitution is

15:08:18  7    appropriate, given the defendant's circumstances, and of course

15:08:22  8    the $200 special assessment is required by law.

15:08:27  9         I think that sentence satisfies the sentencing

15:08:29  10   objectives required by 18 U.S.C. 3553(a) and also meets the

15:08:33  11   objectives set forth in the guidelines and it is an appropriate

15:08:39  12   sentence in this case of being sufficient but not greater than

15:08:42  13   necessary to achieve the sentencing objectives required by

15:08:45  14   statute.

15:08:46  15        I do intend to impose each of the mandatory and

15:08:49  16   special conditions of supervision as set forth in Part D of the

15:08:53  17   presentence report.  And I do believe that the five-year term

15:08:56  18   of supervised release will allow for reintegration into the

15:09:01  19   community and provide deterrence from subsequent criminal

15:09:04  20   behavior.  I recognize that Mr. Hibler will be a much older man

15:09:07  21   at the conclusion of his 262-month sentence, but I still

15:09:12  22   believe that a five-year term of supervised release is

15:09:14  23   appropriate because these are -- these are issues not easily

15:09:22  24   addressed or overcome.

15:09:25  25        In light of the defendant's conviction in this

15:09:28   1   case and the nature of the offense, I'm going to require him to

15:09:30   2   comply with several special conditions of supervised release,

15:09:35   3   including special computer crime conditions, no unsupervised

15:09:38   4   contact with minors unless approved by the probation officer,

15:09:42   5   participation in mental health treatment and/or sex offender

15:09:47   6   treatment program, and submission of his person, house,

15:09:48   7   residence, vehicles, papers, business or place of employment

15:09:51   8   and any property under his control to search conducted by the

15:09:53   9   United States Probation Office at any reasonable time and

15:09:55  10   manner based upon reasonable suspicion of contraband or

15:09:58  11   evidence of a violation of the condition of release.

15:10:02  12          Defendant's been in custody since his arrest, and

15:10:05  13   I intend to order him detained.  He's not a good candidate for

15:10:08  14   voluntary surrender.

15:10:09  15          That's the tentative sentence of the court.  Are

15:10:11  16   there any objections?

15:10:13  17          MR. HART:  Not from the Government, Your Honor.

15:10:14  18          MR. GRADERT:  No, Your Honor.

15:10:15  19          THE COURT:  Very well.  Mr. Hibler, would you

15:10:18  20   please stand.

15:10:19  21          (The defendant complies.)

15:10:22  22          THE COURT:  The Court determines that the

15:10:24  23   presentence investigation report, as modified by the Court and

15:10:29  24   in its previous statements and its previously stated findings,

15:10:32  25   are accurate and I'm ordering those to be incorporated into the

15:10:35  1   following sentence.  Pursuant to the Sentencing Reform Act of

15:10:38  2   1984, it is the judgment of the Court that the defendant, Gary

15:10:43  3   Jay Hibler, is hereby committed to the custody of the Bureau of

15:10:46  4   Prisons to be imprisoned for a term of 262 months on Count 1

15:10:52  5   and 120 months on Count 2, to run concurrently, for a total

15:10:58  6   controlling sentence of 262 months.  Upon release from

15:11:00  7   imprisonment, the defendant shall be placed on supervised

15:11:03  8   release for a term of five years on Count 1 and five years on

15:11:06  9   Count 2, to run concurrently, for a controlling term of five

15:11:09  10  years of supervised release.

15:11:10  11          Within 72 hours of release from the custody of the

15:11:13  12  Bureau of Prisons, defendant shall report to the probation

15:11:16  13  office in the district to which he is released.  While on

15:11:19  14  supervised release defendant shall not commit another federal,

15:11:21  15  state, or local crime, shall comply with the standard

15:11:25  16  conditions of supervision that have been adopted by this court,

15:11:28  17  and the mandatory and special conditions of supervision

15:11:30  18  previously stated by the Court.

15:11:32  19          Fine is waived in this matter, but the defendant

15:11:35  20  is required to pay the United States a special assessment of

15:11:38  21  $200 pursuant to the provisions of 18 U.S.C. 3013, the Crime

15:11:44  22  Victims Fund.  This assessment's due immediately and may be

15:11:47  23  satisfied while in Bureau of Prisons custody.  Defendant is not

15:11:50  24  a good candidate for voluntary surrender and he's remanded to

15:11:54  25  the custody of the United States Marshals Service pending

15:11:56  1   designation by the Bureau of Prisons.

15:11:58  2              Both the Government and the defendant are advised

15:12:00  3   as to their respective rights to appeal this sentence and

15:12:03  4   conviction.  Any appeal taken is subject to 18 U.S.C. 3742 and

15:12:07  5   subject to any waiver in the plea agreement in this case.

15:12:11  6   Defendant's advised that it's your right to appeal this

15:12:14  7   conviction and sentence only to the extent that you've not

15:12:16  8   waived that right, and even to that extent you can lose your

15:12:18  9   right to appeal if you do not timely file a notice of appeal in

15:12:21  10  the district court.  Rule 4(b) of the Federal Rules of

15:12:24  11  Appellate Procedure gives you 14 days after entry of judgment

15:12:26  12  to file a notice of appeal.

15:12:28  13             If you request, the clerk of the court can

15:12:30  14  immediately prepare and file a notice of appeal on your behalf.

15:12:33  15  And if you're unable to pay the costs of appeal, you have the

15:12:35  16  right to apply for leave to appeal in forma pauperis.

15:12:39  17             At this time I think we have a prior indictment

15:12:42  18  that needs to be dismissed, Mr. Hart; is that correct?  I say

15:12:50  19  indictment.  It's actually, I think, a complaint or

15:12:54  20  information?

15:12:56  21             MR. GRADERT:  Your Honor, there was a superseding

15:12:58  22  indictment in this case.

15:13:01  23             THE COURT:  Well, I admit I'm not on top of this

15:13:04  24  the way I should be.

15:13:05  25             MR. GRADERT:  But that's what we pled to, Your

15:13:07   1   Honor, was the superseding.

15:13:09   2              MR. HART:  That is correct.

15:13:10   3              THE COURT:  Oh, there it is.  I found it.  So the

15:13:13   4   prior indictment needs to be dismissed.

15:13:16   5              MR. HART:  There would have been a complaint and

15:13:18   6   then there would have been an indictment, I believe, and then a

15:13:21   7   superseding indictment, so yes.

15:13:23   8              MR. GRADERT:  No objection.

15:13:24   9              THE COURT:  So your motion is?

15:13:25   10             MR. HART:  I'm sorry, Your Honor.  To the extent

15:13:27   11  that either the complaint or the --

15:13:30   12             THE COURT:  Initial indictment?  There was an

15:13:33   13  indictment filed on September 8th and a superseding indictment

15:13:36   14  filed on December 1st.

15:13:41   15             MR. GRADERT:  You superceded the parent aspect of

15:13:42   16  the case.

15:13:42   17             MR. HART:  Correct.  And to the extent that those

15:13:44   18  have not been dismissed previously, the Government would so

15:13:47   19  move.

15:13:47   20             THE COURT:  All right.  That motion will be

15:13:48   21  granted and those prior complaints will be dismissed.  Is there

15:13:51   22  anything else that needs to come before the court on this

15:13:53   23  matter?

15:13:53   24             MR. GRADERT:  No, Your Honor.  Thank you.

15:13:54   25             THE COURT:  All right.  That'll conclude this

15:13:56   1    hearing.   The Court's in recess.

15:13:57   2                    (Whereupon, the proceedings were concluded at 3:14

15:14:01   3                p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court
Reporter in and for the District of Kansas, do hereby
certify:

That the above and foregoing proceedings were
taken by me at said time and place in stenotype;

That thereafter said proceedings were
transcribed under my direction and supervision by means
of computer-aided transcription, and that the above and
foregoing constitutes a full, true and correct
transcript of said proceedings;

That I am a disinterested person to the said
action.

IN WITNESS WHEREOF, I hereto set my hand on
this the 18th day of May, 2012.


                    s/ Johanna L. Wilkinson
                    Johanna L. Wilkinson, CSR, CRR, RMR
                    United States Court Reporter